IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| Q. C., *a minor*,<br>KELLY CRONIN, *individually and*<br>*on behalf of Q.C.*, and<br>MCNEIL CRONIN, *individually and*<br>*on behalf of Q.C.*,<br><br>  Plaintiffs,<br><br>v.<br><br>WINSTON-SALEM/FORSYTH<br>COUNTY SCHOOLS BOARD<br>OF EDUCATION,<br><br>  Defendant. | 1:19CV1152 |

**MEMORANDUM OPINION AND ORDER**

LORETTA C. BIGGS, District Judge.

Plaintiffs Q.C. and her parents ("Plaintiffs") bring this action against the Winston-Salem/Forsyth County Schools Board of Education ("School Board") alleging discrimination based on disability in violation of Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C.A. § 794, and Title II of the Americans with Disabilities Act ("Title II"), 42 U.S.C. § 12132. (ECF No. 11 ¶ 1.) Plaintiffs also allege a violation of the equal protection clause of the Fourteenth Amendment ("§ 1983"), 42 U.S.C. § 1983. (*Id.*) Plaintiffs seek compensatory damages, as well as injunctive, equitable, and declaratory relief. (*Id.* ¶¶ 196–204.) Before the Court is Defendant's Motion for Partial Dismissal of Amended Complaint. (ECF No. 14.) For the reasons that follow, Defendant's motion will be denied.

**I.     BACKGROUND**

Q.C. is a minor child who lives in Forsyth County, North Carolina with her parents. (ECF No. 11 ¶¶ 16–17.) The allegations of the Complaint[1], accepted as true and viewed in the light most favorable to Plaintiffs, show the following:

At the time this action was initiated, Q.C. was a seven-year old kindergartener. (*Id.* ¶ 29.) Q.C. has an average nonverbal IQ, has been diagnosed with Down syndrome, and has facial features that are characteristic of a child with Down syndrome. (*Id.* ¶¶ 30, 31.) In April 2015, Q.C.'s parents enrolled her in Winston-Salem/Forsyth County Schools ("W-S/FCS") for preschool at which time it was determined that she was eligible for special education services in the category "Developmental Delay." (*Id.* ¶ 33.) W-S/FCS created an Individualized Education Program ("IEP") for Q.C. in 2015 and 2016, both of which placed Q.C. in a special education preschool class for a portion of the school day. (*Id.* ¶¶ 33–34.) Her parents allege this was a "segregated" setting, so they removed Q.C. from W-S/FCS' preschool and enrolled her in private preschool where she was educated alongside children who were not disabled. (*Id.* ¶ 35.) When it was time for Q.C. to begin kindergarten, her parents again enrolled her in the W-S/FCS system where she was assigned to her parents' first choice of Whitaker Elementary School ("Whitaker") to begin school in the fall of 2018. (*Id.* ¶ 39.) Q.C. underwent kindergarten screening in May 2018 and additional testing in the summer of 2018. (*Id.* ¶¶ 41, 42.) A psychological evaluation of Q.C. conducted in July 2018 again indicated that she had an average nonverbal IQ. (*Id.* ¶¶ 43–44.)

---

[1] Plaintiffs amended their original complaint on February 13, 2020. (*See* ECF No. 11.) The Amended Complaint serves as the operative complaint in this matter.

Despite Q.C.'s tests showing that she had an average nonverbal IQ, before the school year began, her father was informed that W-S/FCS had decided to place her in a "Readiness classroom" at a different elementary school—not Whitaker. (*Id.* ¶ 45.) According to the Amended Complaint, the Readiness classroom is for students with below average cognitive abilities, (*id.* ¶ 46), and Q.C.'s father objected to the placement, (*id.* ¶ 47). Q.C. began kindergarten at Whitaker without an IEP or supplemental aids in place; however, school employees tracked her behavior and removed her from the general education setting during the school day without parental consent. (*Id.* ¶¶ 53–58, 60.) Ten days after Q.C. began school, an IEP meeting was held, and her placement was officially changed to a Readiness classroom. (*Id.* ¶¶ 59, 64.) Q.C.'s parents requested another IEP meeting for the district to reconsider placing Q.C. in a Readiness classroom and during this meeting Whitaker's principal stated that Q.C. would have never been placed at Whitaker "had [the district] known she had Down syndrome" or a "disability." (*Id.* ¶¶ 81–82.) Q.C.'s parents expressed their concern over the statements regarding Q.C.'s placement and during the meeting determined that they would withdraw Q.C. from W-S/FCS and enroll her in private school. (*Id.* ¶ 85.) Q.C. began to attend private school and was educated alongside nondisabled children with the assistance of a one-on-one aide. (*Id.* ¶ 91.)

Plaintiffs filed a due process petition in the North Carolina Office of Administrative Hearings ("OAH") alleging that W-S/FCS denied Q.C. a free appropriate public education ("FAPE") in violation of the Individuals with Disabilities Education Improvement Act ("IDEA"). (*Id.* ¶ 93.) Ultimately, the administrative law judge ("ALJ") found that Defendant failed to comply with the procedural requirements of the IDEA and ordered, *inter alia*, that

3

Defendant implement a plan to transition Q.C. back into W-S/FCS. (*Id.* ¶¶ 24–25.) Plaintiffs contend that Defendant failed to implement the ALJ's order as directed which resulted in Q.C. continuing to attend private school in the spring of 2020. (*Id.* ¶ 112.)

Plaintiffs' Amended Complaint alleges that Defendant violated Section 504 of the Rehabilitation Act (Count I); Title II of the ADA (Count II); and the Fourteenth Amendment (Count III). (*Id.* ¶¶ 118–37.) Plaintiff also seeks attorneys' fees under the IDEA (Count IV) and reimbursement for costs and expenses incurred by Q.C.'s attendance in private school (Count V). (*Id.* ¶¶ 178–90.) Further, Plaintiffs seek declaratory, compensatory, injunctive, and equitable relief. (*Id.* ¶¶ 196, 198–200.) Defendant moves to dismiss Counts I, II, and III of the Amended Complaint pursuant to Rules 12(b)(1) and (6) for lack of subject matter jurisdiction and for failure to state a claim upon which relief may be granted. (ECF No. 14.)

## II. LEGAL STANDARDS

A motion to dismiss under Rule 12(b)(1) raises the question of "whether [the plaintiff] has a right to be in the district court at all and whether the court has the power to hear and dispose of [the] claim." *Holloway v. Pagan River Dockside Seafood, Inc.*, 669 F.3d 448, 452 (4th Cir. 2012). The burden of proving subject-matter jurisdiction rests with the plaintiff. *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). A court should only grant dismissal pursuant to a 12(b)(1) motion "if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Richmond, Fredericksburg & Potomac R.R. Co. v. United States,* 945 F.2d 765, 768 (4th Cir. 1991).

A motion to dismiss filed pursuant to Rule 12(b)(6) "challenges the legal sufficiency of a complaint." *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009). To survive dismissal, a

4

Case 1:19-cv-01152-LCB-JEP   Document 29   Filed 04/15/21   Page 4 of 18

complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In assessing a claim's plausibility, a court must draw all reasonable inferences in the plaintiff's favor. *Vitol, S.A. v. Primerose Shipping Co.*, 708 F.3d 527, 539 (4th Cir. 2013). However, "mere conclusory and speculative allegations" are insufficient, *Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013), and a court "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments," *Vitol*, 708 F.3d at 548 (quoting *Jordan v. Alt. Res. Corp.*, 458 F.3d 332, 338 (4th Cir. 2006)).

### III. DISCUSSION

#### A. Whether Plaintiffs have Article III Standing

Defendant advances several arguments as to why Plaintiffs' Section 504, Title II, and § 1983 claims should be dismissed. The Court will first address Defendant's contention that it does not have jurisdiction over any of these claims because "Plaintiffs seek only forward-looking relief" and therefore lack standing. (ECF No. 15 at 7–8.)

The jurisdiction of a federal court is limited to cases and controversies under Article III of the United States Constitution. U.S. Const. art. III, § 2. Standing to sue, therefore, "ensure[s] that federal courts do not exceed their authority." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). To establish constitutional standing at the motion to dismiss stage, Plaintiffs must plausibly allege that they have: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* Plaintiffs bear the burden of establishing these elements. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). "Where, as here, a case is at the pleading

5

stage, [Plaintiffs] must 'clearly . . . allege facts demonstrating' each element." *Spokeo*, 136 S. Ct. at 1547 (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).

To establish an injury-in-fact, a plaintiff "must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual and imminent, not conjectural or hypothetical.'" *Id.* at 1548 (quoting *Lujan*, 504 U.S. at 560). The Supreme Court has held that when a party has "set forth no specific facts demonstrating" the alleged injury, such allegations "are necessarily conjectural." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 412, 420 (2013) (finding that plaintiffs did not have standing when they "present[ed] no concrete evidence to substantiate their fears" and could "only speculate" as to whether an injury might have occurred or will occur in the future). Further, a plaintiff who seeks to enjoin future action "must demonstrate that he is immediately in danger of sustaining some direct injury as the result of the challenged official conduct" and the threat of injury is "real and immediate." *Beck v. McDonald*, 848 F.3d 262, 277 (4th Cir. 2017) (internal citation and quotation omitted).

The three claims Defendant moves to dismiss seek exclusively declaratory, injunctive, and equitable relief. (*See* ECF No. 11 ¶¶ 196, 199 200.) In seeking such "prospective equitable relief instead of damages for a concrete past harm," Plaintiffs must allege that there is a "real and immediate threat" that harm will befall them again. *Bryant v. Cheney*, 924 F.2d 525, 529 (4th Cir.1991) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–03 (1983)).

Here, Defendant does not dispute that the Amended Complaint alleges past harm; rather, Defendant argues that Plaintiffs fail to allege either current ongoing injury or a real or immediate threat of injury in the future. (ECF No. 15 at 10.) The Court does not agree.

6

Defendant contends that "Plaintiffs' vague allegation that they 'desire to enroll' Q.C. in [W-S/FCS] . . . is insufficient to plead that Q.C. is at risk of imminent injury." (ECF No. 15 at 12.) In support of this contention, Defendant relies on several cases including *Summers v. Earth Island Institute*, 555 U.S. 488, 493 (2009) and *Payne v. Chapel Hill North Properties, LLC*, 947 F. Supp. 2d 567 (M.D.N.C. 2013). The Court finds that Defendant's reliance on each of these cases is misplaced. In *Summers*, the Supreme Court discussed whether an individual's vague desires to return to a location of a prior harm was sufficient to satisfy the requirement of imminent injury. 555 U.S. at 496. There, the court determined that no "firm intention" to visit a location was stated, rather a "some day" intention "without any description of concrete plans" or "when that some day [would] be." *Id.* at 498.

Likewise, in *Payne*, the court analyzed the plausibility of a plaintiff's claim that she was likely to return to a site of discrimination in its discussion of whether she had alleged an actual or imminent injury. 947 F. Supp. 2d 567, 573 –74. *Payne* involved a plaintiff who lived in Florida attempting to allege an imminent threat of injury at a location that was over 700 miles away from her home that she alleged she had visited approximately three times in a two- year span. *Id.* at 575–76.[2] Further, the underlying facts suggested that plaintiff would fly into North Carolina and go to locations as an ADA "tester."[3] Ultimately, the court in *Payne* did not find the plaintiff's claim that she frequently traveled nearby the site at issue credible. *Id.* at 576.

---

[2] In reaching its determination, the court in *Payne* analyzed: (1) the proximity of the plaintiff to the defendant's place of public accommodation; (2) the plaintiff's past patronage of the location at issue; (3) the definitiveness of plaintiff's plan to return to the location at issue; and (4) the plaintiff's frequency of nearby travel. *Id.*

[3] An ADA tester is a disabled person who travels around the country seeking out businesses that are open to the public and which do not comply with the ADA.

The facts in each of these cases are clearly distinguishable from those alleged in the instant matter. Plaintiffs have alleged far more than a mere desire to enroll Q.C. in W-S/FCS as argued by Defendants. Plaintiffs have explicitly alleged an intention to re-enroll Q.C. in W-S/FCS along with her siblings, and have alleged that they intend to do so, "as soon as [W-S/FCS] permanently ceases its discriminatory practices with regard to students with Down syndrome." The pertinent allegations in the Amended Complaint include the following:

> 114. . . . the ongoing actions, and inaction, of the WS/FCS are preventing them from re-enrolling Q.C. until there is an injunction in place ordering the WS/FCS to cease its discriminatory practices.
>
> 115. Without a permanent injunction, Q.C.'s parents—who continue to reside in the WS/FCS and desire to enroll Q.C. and her siblings in the WS/FCS—are unable to do so, as re-enrolling Q.C. will place her at imminent risk of discriminatory treatment and placement because of the following non-exhaustive list of actions taken by the district:
>
> . . .
>
> 116. Q.C.'s parents intend to enroll Q.C. and her siblings in the WS/FCS as soon as the WS/FCS permanently ceases its discriminatory practices with regard to students with Down syndrome.

(ECF No. 11 ¶¶ 114–16.) These allegations are both plausible and credible in that as detailed in the Amended Complaint, Q.C. and her family reside in the district, have enrolled her on two prior occasions and intend for her siblings to likewise attend school in the district.

Construing the allegations in the Amended Complaint in the light most favorable to Plaintiffs and drawing all inferences in their favor, the Court determines that Plaintiffs have alleged sufficient facts to allege both current harm as well as an imminent threat of future harm. As such, Defendant's motion to dismiss Counts I-III based on lack of standing is denied.

### B. Whether Plaintiffs' Section 504, Title II, and § 1983 claims are precluded under *res judicata*

Next, according to Defendant, Plaintiffs' claims under Section 504, Title II, and § 1983 are barred by the doctrine of *res judicata* as they arise from the same set of facts that gave rise to Plaintiffs' claim before the OAH with respect to their IDEA claims. (ECF No. 15 at 15.) "Under *res judicata* principles, a prior judgment between the same parties can preclude subsequent litigation on those matters actually and necessarily resolved in the first adjudication." *Covert v. LVNV Funding, LLC*, 779 F.3d 242, 246 (4th Cir. 2015) (quoting *In re Varat Enters., Inc.*, 81 F.3d 1310, 1314–15 (4th Cir.1996). The Fourth Circuit has provided that for a court to determine that *res judicata* is applicable, there must be: "(1) a final judgment on the merits in a prior suit; (2) an identity of the cause of action in both the earlier and the later suit; and (3) an identity of parties or their privies in the two suits." *Pueschel v. United States*, 369 F.3d 345, 354–55 (4th Cir. 2004) (citations omitted). In addition to these three elements, a court must take into account the "practical considerations" of whether a party knew of its claims at the time of the first action and whether the court that presided over the first suit was an effective forum to litigate the relevant claims. *Providence Hall Assocs. Ltd. P'ship v. Wells Fargo Bank, N.A.*, 816 F.3d 273, 276 (4th Cir. 2016).

Despite Defendant's contention that *res judicata* is appropriate because "Plaintiffs' Section 504, Title II, and Section 1983 claims are based on the same core of operative facts" as the claim that was brought before OAH, (ECF No. 15 at 18), Defendant does not account for this Court's consideration of whether the tribunal that presided over the IDEA claim was an effective forum to litigate Plaintiffs' Section 504, Title II, and § 1983 claims as well. As Plaintiffs point out, N.C. Gen. Stat. § 115C-109.6 expressly discusses OAH hearing claims

9

brought pursuant to the IDEA, not the three related federal claims at issue. Moreover, the IDEA expressly contains a provision that states that:

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973, or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

20 U.S.C.A. § 1415(l).

Indeed, the Supreme Court has explained that "[t]he first half of § 1415(l) . . . reaffirms the viability of federal statutes like the ADA or Rehabilitation Act as separate vehicles, no less integral than the IDEA, for ensuring the rights of [disabled] children." *Fry v. Napoleon Cmty. Schs.*, 137 S. Ct. 743, 750 (2017) (internal quotations omitted). However, a plaintiff who "[brings] suit under the ADA, the Rehabilitation Act, or similar laws must in certain circumstances—that is, when seeking relief that is also available under the IDEA—first exhaust the IDEA's administrative procedures." *Id.* (internal quotations omitted).

Defendant relies on two cases to support its position that *res judicata* applies. (*See* ECF No. 15 at 15–16.) First, Defendant relies on *Draper v. Atlanta Individual School System*, 377 F. App'x 937, 940 (11th Cir. 2010), where the Eleventh Circuit addressed *res judicata* in the context of a plaintiff's challenge under Section 504 of the Rehabilitation Act related to the education he received. However, that case is distinguishable from the instant matter. The court determined that *res judicata* did apply where plaintiff had already litigated a challenge to the education he received in another federal court—by appealing an ALJ determination on an IDEA challenge. *See id.* at 940. The court reasoned that nothing prevented Plaintiff from

10

demanding relief under Section 504 when he appealed the ALJ determination to federal court in the first instance. *Id.* Likewise, in *Ross v. Board of Education of Township High School District*, the Seventh Circuit analyzed whether *res judicata* was applicable in the context of a lawsuit being brought in federal court under the ADA after a suit regarding the same underlying events had been brought in an earlier suit under the IDEA also in federal court. *See* 486 F.3d 279, 281–83 (7th Cir. 2007). Defendant's reliance upon these distinguishable cases is misplaced.

In the instant matter, while the relevant claims that Plaintiffs bring before the Court seek relief for the denial of a FAPE under Section 504, Title II, and § 1983, this is the first opportunity for Plaintiffs to press these claims in a federal court, i.e. a court of competent jurisdiction. Thus, even though this lawsuit suit follows Plaintiff having brought an IDEA claim arising out of the same operative facts as those before OAH in which an ALJ issued a final decision in favor of Plaintiffs, unlike the cases offered by Defendant, Defendant did not appeal that final decision to federal court. Thus, *res judicata* does not preclude Plaintiffs claims here. In addition, though Defendant appears to raise some issue of exhaustion as to Counts IV and V of Plaintiff's Complaint, Defendant's motion here only seeks dismissal as to Counts I–III. (ECF No. 15 at 8 n.5.)[4]

Accordingly, Defendant's motion to dismiss pursuant to the doctrine of *res judicata* will be denied.

---

[4] Defendant argues that "Plaintiffs have not exhausted their administrative remedies to seek relief pertaining to issues arising after the due process petition was filed." (ECF No. 15 at 8 n.5.) In response Plaintiffs argue that they are not pursing further IDEA claims, but enforcement of the ALJ ordered remedy. (ECF No 21 at 12.) At this stage, the Court is not determining the extent, if any, of Plaintiffs' claimed remedy, rather solely whether they have sufficiently stated a claim under Section 504, Title II, and § 1983.

### C. Whether Plaintiffs have sufficiently stated a claim under Section 504 and Title II

Next, Defendant alleges that Plaintiffs' Amended Complaint does not contain sufficient facts to set forth a Section 504 claim or a Title II claim because they "fail to allege bad faith or gross misjudgment." (ECF No. 15 at 18.)

To make out a claim under Section 504 or Title II[5], a plaintiff must prove she: (1) has a disability; (2) is "otherwise qualified to receive the benefits of a public service, program, or activity"; and (3) she was "denied the benefits of such service, program, or activity, or otherwise discriminated against," on the basis of her disability. *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 503 (4th Cir. 2016). However, the third element of causation is different for the two claims in that to succeed on a claim under Section 504, "the plaintiff[s] must establish [they were] excluded solely by reason of [their] disability"; whereas "[Title II of] the ADA requires only that the disability was a motivating cause of the exclusion." *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 461–62 (4th Cir. 2012) (citing *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 468–69 (4th Cir. 199) (internal quotations omitted). Further, to set forth a claim of discrimination under Title II or Section 504 in the context of disabled children a plaintiff must show "either bad faith or gross misjudgment." *O.V. v. Durham Pub. Sch. Bd. of Educ.*, No. 1:17CV691, 2018 WL 2725467, at *23 (M.D.N.C. June 6, 2018), recommendation adopted, No. 1:17CV691, 2018 WL 3370644 (M.D.N.C. July 10, 2018). Conclusory allegations of gross misjudgment or bad faith without further factual development fall short of stating a claim under Title II or Section 504. *See Charlotte–Mecklenburg Bd. of Educ. v. B.H. ex rel. C.H. & W.H.*,

---

[5] As Plaintiffs have observed, the analysis of claims brought pursuant to Section 504 and Title II are closely related and may be treated the same for analytical purposes because the analysis is substantially the same. *See Seremeth v. Bd. of Cnty. Comm'rs Frederick Cnty.*, 673 F.3d 333, 336 n.1 (4th Cir. 2012).

No. 3:07CV189, 2008 WL 4394191, at *7 (W.D.N.C. Sept. 24, 2008) (explaining that "simply labeling the conduct at issue as having been performed in bad faith is insufficient to allege[ ] that the actions in question rise to that level").

According to Defendant, Plaintiffs do not include factual allegations to support "their conclusory allegation that the [School] Board acted in bad faith and demonstrated gross misjudgment toward Q.C." (ECF No. 15 at 19.) However, the Amended Complaint alleges more than just conclusory statements. Among other allegations, the Amended Complaint alleges that Q.C. has Down syndrome and the facial characteristics associated with Down syndrome and that despite Q.C. being diagnosed with Down syndrome, she has an average nonverbal IQ and is capable of learning alongside her nondisabled peers. (ECF No. 11 ¶¶ 30–32.) According to Plaintiffs, despite Q.C.'s IQ, Defendant decided to place her in a Readiness classroom, which is a "segregated" classroom. (*Id.* ¶ 45, 46.) Plaintiffs allege that Defendant did not seek to reassign any of Q.C.'s peers without Down syndrome who had average nonverbal IQs. (*Id.* ¶ 48.)

Further, Plaintiffs allege that Defendant acted in bad faith at multiple stages of their attempts to enroll Q.C. into W-S/FCS. Plaintiffs claim that school officials deceptively tested Q.C. for special education services only under the category of Intellectual Disability due to her Down syndrome, proactively developed forms for the purpose of magnifying any noncompliant behavior to justify placing Q.C. in a segregated setting, tracked Q.C.'s behavior without parental consent, removed Q.C. from regular education classrooms daily to teach her in a segregated setting without parental consent. (*Id.* ¶¶ 42, 53, 54, 57.) Finally, and most glaringly, Plaintiffs allege that the principal at Whitaker indicated that Q.C.'s placement at

13

Whitaker "would have never been accepted had [the school system] known that she had Down syndrome" or a disability. (*Id.* ¶ 81, 82.)

These allegations are sufficient to support a finding of bad faith or gross misjudgment on part of Defendant. As such, these detailed allegations taken as true and construed in the light most favorable to Plaintiff, are sufficient to state a claim under both Title II and Section 504. As such, Defendant's motion will be denied with respect to Plaintiffs' Title II and Section 504 claims (Claims I and II).

### D. Plaintiffs' § 1983 claims

Finally, Defendant moves to dismiss Plaintiffs' § 1983 claim for the differential treatment Q.C. was subjected to solely based on her Down syndrome. Defendant argues that Plaintiffs' § 1983 claim is barred because, according to Defendant, a claim may not be supported by an alleged IDEA violation. (ECF No. 15 at 20.) Defendant also argues that "the allegations of the Complaint are insufficient to state an equal protection claim under the Fourteenth Amendment" and that Plaintiffs "fail to allege any basis by which the purported discrimination could be imputed to the [School] Board." (*Id.* at 20, 22.)

First, Defendant contends that "[b]ecause Plaintiffs' [§ 1983] claims arise out of the same facts and allegations as the IDEA claims, they should be dismissed in their entirety." (*Id.* at 20.) Defendant points to the Fourth Circuit's decision in *Sellers by Sellers v. Sch. Bd. of Manassas*, 141 F.3d 524, 529 (4th Cir. 1998), in support of its contention. (*Id.*) However, Defendant's argument misconstrues and expands the reading of the Fourth Circuit's decision in *Sellers*. The plaintiffs in *Sellers* asserted a § 1983 claim based on the defendants' failure to provide their son with a free appropriate public education under the IDEA. 141 F.3d 524 at

14

529. The Fourth Circuit explained that this was an impermissible attempt to circumvent the IDEA and that plaintiffs may not sue under [§ 1983] for IDEA violations "[b]ecause [the] IDEA provides a comprehensive remedial scheme for violations of its own requirements." *Id.* Nevertheless, the court in *Sellers* explained that "section 1415(f) does permit plaintiffs to resort to section 1983 for c*onstitutional* violations, notwithstanding the similarity of such claims to those stated directly under IDEA." *Id.* at 530 (emphasis in original). As such, Plaintiffs may pursue a § 1983 claim for alleged "constitutional failures" regarding Q.C. *Id.* at 531. In the instant matter, while the factual allegations in the Amended Complaint may arise from the same set of facts presented in Plaintiffs' complaint before the Office of Administrative hearings, their § 1983 claim is not based on an alleged IDEA violation, rather Plaintiffs assert a constitutional violation.

The Fourth Circuit has explained that "[t]o succeed on an equal protection claim, [a plaintiff] must first demonstrate that [s]he has been treated differently from others with whom [s]he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Veney v. Wyche*, 293 F.3d 726, 730–31 (4th Cir. 2002) (internal quotations and citations omitted). If a plaintiff makes this showing, "the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." *Id.* at 731. In an educational context, this means that a plaintiff must show that "a school board intended to treat children differently because of their disabilities," and that such a decision "was without any rational basis."[6] *Sellers*, 141 F.3d at 530–31. As such, to state an equal protection claim, Plaintiffs must plead sufficient facts to satisfy each requirement.

---

[6] The Fourth Circuit explains in *Sellers* that "the Supreme Court has yet to classify disabled persons as a suspect class" and it "also has not identified education as a fundamental right." 141 F.3d at 530–531.

The Fourth Circuit has explained that "the equal protection requirement does not take from the States all power of classification but keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Wyche*, 293 F.3d at 730. "[T]he Supreme Court has recognized the validity of 'class of one' Equal Protection claims, 'where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" *Willis v. Town of Marshall*, 426 F.3d 251, 263 (4th Cir. 2005) (quoting *Vill. Of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).

Plaintiffs allege that under the Fourteenth Amendment, Q.C. has "the right as a public school student to equal access to an educational environment free from discrimination." (ECF No. 11 ¶ 134.) Plaintiffs claim that Defendant "intentionally treated Q.C. differently from other kindergarten students solely based on her Down syndrome" and that Q.C. was treated "differently and more harshly than her peers" with no rational basis and with animus. (*Id.* ¶ 136, 137.) The Amended Complaint similarly alleges that Defendant insisted that Q.C. be taught in a segregated environment and without supplemental aids that it knew would allow her to be educated alongside her nondisabled peers and provided her parents with false information. (*Id.* ¶ 136.) Plaintiffs also claim that there are no other students with Down syndrome at Whitaker Elementary and Whitaker's principal expressly stated that Q.C. would have never been enrolled in Whitaker if they were aware of her disability. (*Id.* ¶¶ 81–82, 110.)

Defendant's argument that Plaintiff has failed to allege any facts that would impute liability to the School Board also fails. A plaintiff who seeks a claim via § 1983 for equal protection by a school district must show that the alleged wrong was the result of municipal

16

Case 1:19-cv-01152-LCB-JEP   Document 29   Filed 04/15/21   Page 16 of 18

custom, policy, or practice.  *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257–58 (2009) (citing *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 694 (1978)).  A policy or custom may be alleged by: (1) an expressed policy; (2) through decisions of a person with final policymaking authority; (3) through an omission that constitutes a deliberate indifference to the right of citizens; and (4) through a persistent and widespread practice that constitutes a custom.  *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003).  However, Section 1983 claims are not subject to a heighted pleading standard paralleling the rigors of proof demanded on the merits.  *Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994) (citing *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 167–68 (1993)).

In the Amended Complaint, Plaintiffs allege that W-S/FCS had a pattern of placing students with Down syndrome in segregated placements as demonstrated by their allegations that Whitaker, Meadowlark, and Brunson did not have students with Down syndrome enrolled.  (ECF No. 11 ¶ 110.)  Plaintiffs allege that at least three principals of elementary schools within the W-S/FCS system confirmed that the determination of the placement of students was conducted contrary to federal law, specifically with respect to children like Q.C. where there is an assumption made about their IQ.[7]  (*Id.* ¶¶ 106–110.)  The Court determines that these allegations, taken as true, are sufficient to allege that a custom or practice exists with respect to the placement of children with, or perceived to be with, disabilities.

---

[7] The three schools in W-S/FCS system that Plaintiffs reference are Whitaker, Meadowlark Elementary ("Meadowlark"), and Brunson Elementary ("Brunson").  Plaintiffs allege that Principal Creasy of Whitaker indicated that Q.C.'s placement at Whitaker would have never been accepted had it been known that she had a Down syndrome or a disability.  (ECF No. 11 ¶¶ 81, 82.) Plaintiffs also allege that Principal Raymer of Meadowlark made statements indicating that students were placed in classes in a manner contrary to federal law.  (*Id.* ¶¶ 106–07.)  Finally, Plaintiffs allege that Principal Faullin of Brunson indicated that Brunson had never enrolled a student with Down syndrome.  (Id. ¶ 109.)

17

Taken in the light most favorable to Plaintiffs and construing all reasonable inferences in their favor, these factual allegations set forth a plausible § 1983 equal protection claim that may be imputed to Defendant. Therefore, Defendant's motion with respect to Plaintiffs' 1983 claim will be denied.

## IV. CONCLUSION

For the reasons set forth above, Plaintiffs have standing to bring their Section 504, Title II and § 1983 claims against Defendant and those claims are not barred by the doctrine of *res judicata*. Further, Plaintiffs have pleaded sufficient facts to set forth each of these claims. For the reasons discussed above, the Court will enter the following:

## ORDER

**IT IS THEREFORE ORDERED** that Defendant's Motion for Partial Dismissal of Amended Complaint, (ECF No. 14), is **DENIED**.

This, the 15th day of April 2021.

/s/ Loretta C. Biggs
United States District Judge