IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| Q.C., *a minor*, KELLY CRONIN, *individually and on behalf of Q.C.*, and MCNEIL CRONIN, *individually and on behalf of Q.C.,* )<br><br>Plaintiffs, )<br><br>v. )<br><br>WINSTON-SALEM/FORSYTH COUNTY SCHOOLS BOARD OF EDUCATION, )<br><br>Defendant. ) | 1:19CV1152 |

## MEMORANDUM OPINION AND ORDER

LORETTA C. BIGGS, District Judge.

Plaintiff Q.C. is a ten-year-old[1] elementary school student with down syndrome. (ECF Nos. 11 ¶¶ 29–30; 32 ¶¶ 29–30.) She and her parents brought this suit to challenge Defendant's decision to segregate Q.C. from her peers and reassign her to a special classroom by herself at a different school. (ECF No. 11.) They allege violations of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a) ("Section 504"), the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA"), and the Fourteenth Amendment to the U.S. Constitution via 42 U.S.C. § 1983. (*Id.* ¶¶ 118–37.)

Now before the Court are cross motions for summary judgment, (ECF Nos. 54; 56), and Plaintiffs' unopposed motions to seal, (ECF Nos. 59; 66). For the reasons stated herein,

---

[1] Q.C.'s birthday is April 24, 2012. (ECF Nos. 11 ¶ 29; 32 ¶ 29.)

Defendant's Motion for Summary Judgment, (ECF No. 54), will be granted in part and denied in part; Plaintiffs' Motion for Partial Summary Judgment, (ECF No. 56), will be denied; and Plaintiffs' Motions to Seal, (ECF Nos. 59; 66), will be granted.

# I.     BACKGROUND

## A.     Legal Background

Two overlapping laws primarily govern the education of students with disabilities and provide context to the facts in this case. First is Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794. Section 504 broadly provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). The central aim of the Rehabilitation Act was to end the practice of "benign neglect" toward individuals with disabilities. *Alexander v. Choate*, 469 U.S. 287, 295 (1985). Consequently, Section 504 both prohibits invidious discrimination against persons with disabilities and "requires that an otherwise qualified [disabled] individual must be provided with meaningful access to the benefit that the grantee offers" through "reasonable accommodations." *Id.* at 301. In the education context, schools typically comply with Section 504 by developing a "504 Plan . . . to provide students with disabilities certain accommodations that would enable them to participate in education[ ] services and programs provided by a school in compliance with Section 504." *See, e.g.*, *Greenhill v. Loudoun Cnty. Sch. Bd.*, No. 1:19-CV-868, 2020 WL 855962, at *1 n.3 (E.D. Va. Feb. 20, 2020).

The second law of primary importance is the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.* IDEA "offers States federal funds to assist in

2

educating children with disabilities." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 993 (2017). In exchange for the funds, recipient states must comply with certain procedural and substantive requirements, including to "provide a free appropriate public education—a FAPE, for short—to all eligible children." *Id.* Unlike Section 504, which focusses on granting disabled students access to the same or comparable educational opportunities afforded non-disabled students, IDEA requires schools to provide "specially designed instruction . . . to meet the unique needs of a child with a disability," and the "support services 'required to assist a child . . . to benefit from' that instruction." *Id.* at 994 (quoting §§ 1401(26), (29)). The "centerpiece" of this requirement is the Individualized Educational Program ("IEP")—a "comprehensive plan prepared by a child's 'IEP Team'" that is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id.* at 994, 999. The IEP Team includes teachers, school officials, and the child's parents. *Id.* at 994. The IEP identifies services to be provided, sets educational goals, monitor's the student's progress toward these goals, and "when possible," helps them "make progress in the general education curriculum." *Id.* (quoting § 1414(d)(1)(A)(i)(IV)). IEPs must be reviewed and revised annually. § 1414 (d)(4)(A)(i).

### B. Factual background

Q.C. first joined Defendant's school system as a preschooler at age 3 in 2015. (ECF No. 56-2 at 3.) At that time, Q.C. was assessed and assigned an IEP, which included placing Q.C. in a separate preschool class. (*Id.*) Q.C.'s parents disagreed with the assessment, removed her from Defendants' preschool, and enrolled her in a private preschool where she could learn in a regular preschool setting with all nondisabled peers. (*Id.*; *see* ECF Nos. 11 ¶ 35; 32 ¶ 35; 54-14, Findings ¶ 130.)

3

In anticipation of the beginning of kindergarten in Fall 2018, On March 9, 2018, Plaintiffs enrolled Q.C. in Whitaker Elementary, their neighborhood public school and Plaintiffs' first choice for their daughter's schooling. (ECF Nos. 11 ¶ 39; 32 ¶ 39.) Q.C.'s father visited Whitaker with Q.C. on May 22, 2018. (ECF Nos. 11 ¶ 41; 32 ¶ 41.) During this visit, the school convened an "impromptu" IEP meeting with Q.C's father. (ECF Nos. 54-14, Findings ¶¶ 204–05; 56-2 at 4.) No IEP was developed during this meeting, but the school did determine that Q.C. would receive a psychoeducational evaluation. (ECF No. 56-2 at 4.)

Defendant conducted the evaluation on July 19, 2018. (*Id.*) Q.C. was six years old; however, Defendant administered the School-Age Battery scale, which is recommended for children ages seven up-to-but-excluding eighteen, rather than the Early Years Battery scale, which is recommended for children ages two-and-six-months up-to-but-excluding seven. (ECF Nos. 54-14, Findings ¶ 218; 56-57.)

After the test but before the beginning of the school year, without first conducting another IEP meeting or adopting an IEP for Q.C., Defendant's Local Education Agency ("LEA") Representative contacted Plaintiffs and informed them that, based on her test results, Q.C. would not be assigned to Whitaker. Rather, Defendant would place Q.C. in the Readiness Program at South Fork Elementary School—a self-contained class for disabled kindergarten or first grade students located in a trailer behind South Fork Elementary (the "Readiness classroom"). (ECF No. 54-14, Findings ¶¶ 227, 398.) Plaintiffs objected that they wanted Q.C. to attend Whitaker with her friends and classmates from preschool. (*Id.* ¶ 227.) Q.C.'s placement was not changed, and she was allowed to begin kindergarten at Whitaker. (ECF No. 56-2 at 5.)

Also, over the summer, Plaintiffs learned that one of Q.C.'s preschool teachers had accepted a job as a kindergarten teaching assistant at Whitaker and asked that Q.C. be placed in her class. (ECF Nos. 11 ¶ 50; 32 ¶ 50; 54-14, Findings ¶¶ 228–29.) Whitaker's principal refused this request. (ECF No. 54-14, Findings ¶ 230.) According to Plaintiffs' evidence, the principal reasoned that their preferred teacher needed a "fresh start" and that Q.C.'s assigned teacher had "significant experience teaching students with Down syndrome." (*Id.* ¶¶ 230–31.) This was incorrect—the assigned teacher had only taught one student with Down syndrome twenty-three years prior. (*Id.*)

Q.C. began kindergarten without an IEP or 504 Plan on August 27, 2018, at Whitaker. (ECF No. 56-2 at 5.) Prior to the first day, Q.C.'s special education teacher developed forms to track Q.C.'s behavior. (ECF Nos. 11 ¶ 53; 32 ¶ 53.) She used these forms to document Q.C.'s behavior without informing Q.C.'s parents during the first two weeks of school. (ECF Nos. 54-4 ¶ 6; 54-14, Findings ¶ 234.) She testifies that she used these forms for her own knowledge to help in supporting Q.C. (ECF No. 54-5 ¶ 9.) Using these forms, she documented behavioral concerns from Q.C.'s kindergarten teacher. (ECF Nos. 54-4 ¶ 8; 54-5 ¶ 10.) Defendant submits evidence that Q.C. crawled under tables, put instructional materials in her mouth, threw materials, took, and destroyed other students' materials, played in toilets, removed her clothing, refused to come in from recess, and kicked, hit, and licked other students. (ECF Nos. 54-4 ¶ 7; 54-5 ¶ 6.)

Beginning on Q.C.'s second or third day of kindergarten, August 29, 2018, she was removed for one-on-one instruction by the special education teacher for thirty minutes per day without notice to her parents or their consent. (ECF Nos. 54-5 ¶ 7; 54-14, Findings ¶¶ 263, 265.) On September 6, 2018, Q.C.'s mother met with Q.C.'s teacher, assistant

principal, and teaching assistant to receive feedback on Q.C.'s first two weeks of school. (ECF No. 54-14, Findings ¶ 281.) Q.C.'s mother testifies that Q.C.'s teacher complained in detail about Q.C. during the meeting. (*See id.* ¶ 282.) In one assignment, students used stickers that Q.C.'s teacher had purchased with her own money to create posters with their names to be hung in the hallway. (*Id.*) Q.C. evidently "wasted" stickers, so her poster was hung with just a "Q" among her classmate's completed posters. (*Id.*)

Defendant's staff scheduled an IEP meeting for Q.C. on September 11, 2018. (ECF No. 56-2 at 6.) At that time, there was no documentation that Q.C. had received any supplemental aids, supports, modifications, or accommodations, although her special education teacher testified to using some instructional strategies with Q.C. (ECF No. 54-14, Findings ¶ 308.) At 1:10 P.M., approximately two hours before the scheduled IEP meeting, a student pulled the fire alarm in Q.C.'s classroom and the entire building was evacuated. (*Id.* ¶ 314.) Two classmates accused Q.C. of pulling the alarm. (*Id.*) Whitaker's principal then began the IEP meeting by telling Plaintiffs that Q.C. had pulled the alarm, and subsequently placed a Discipline Referral Level III Offense in Q.C.'s educational record. (*Id.* ¶¶ 315, 319.)

Plaintiffs requested accommodations during the IEP meeting. (*Id.* ¶ 324.) Instead, the school-based IEP team members determined Q.C. required specially designed instruction in a special education classroom for 300 of 360 instructional minutes. (*Id.* ¶¶ 252, 396; ECF No. 56-2 at 8.) Whitaker did not have a separate classroom for Q.C., so she would need to again be reassigned to the Readiness classroom at South Fork. (ECF No. 54-14, Findings ¶ 398.) In the interim, Q.C. was removed from class for 90-minutes each day without her parents' knowledge. (*Id.* ¶¶ 405–06; ECF No. 54-5 ¶ 13.) Beginning on September 25, 2018, Q.C. spent school days alone with the special education teacher in her resource room and only had

access to her nondisabled peers during lunch, recess, and special electives. (ECF Nos. 54-14, Findings ¶ 408; 54-5 ¶ 14.) That same day in the cafeteria, Q.C.'s teacher observed Q.C. hugging another student around the neck. (ECF No. 54-15, Findings ¶ 409.) Whitaker's assistant principal and special education teacher documented the incident as an "attempted strangulation." (*Id.* ¶ 410.)

On September 28, 2018, Plaintiffs toured the Readiness classroom at South Fork. (*Id.* ¶ 411.) As mentioned, the Readiness classroom was a self-contained class for kindergarten and first graders with disabilities. (*Id.*) The students learn in a trailer behind South Fork, play on a separate playground, and eat at a separate lunch table from their nondisabled peers. (*Id.*) At Plaintiffs' request, the Whitaker IEP team reconvened on October 1, 2018. (ECF No. 56-2 at 8.) Plaintiffs again asked that Q.C. be given accommodations to learn with her non-disabled peers at Whitaker. (ECF No. 54-14, Findings ¶ 419.) School-based IEP members again refused, primarily citing behavioral concerns. (*Id.* ¶ 429.) Q.C.'s mother testified that, during this meeting, Whitaker's principal stated that Plaintiffs' placement at Whitaker "would never have been accepted had we known she had Down syndrome" or "a disability." (ECF Nos. 56-76 at 398:3-5; 56-87 at 56:24–57:17.) Whitaker's principal disputes this account and testifies that she merely "stated that Q.C. had been assigned to Whitaker without knowledge of her needs and without knowledge that she had a previous IEP." (ECF No. 54-4 ¶ 19; *see also* ECF Nos. 54-10 at 9 ("[A]ssignment was made [without] knowing [Q.C.]'s needs [or] that there was an IEP that said she needs [a] separate setting."); 54-12 at 4 (stating that the principal said Whitaker "let [Q.C.] in [without] knowing her needs" and that "we didn't know she had a disability"). The October 2018 IEP did, however, provide that Q.C. would join non-disabled students for assemblies, field trips, lunch, recess, and specials. (ECF Nos. 54-14, Findings

7

¶ 468; 56-2 at 10.) This was inconsistent with the Readiness self-contained classroom setting at South Fork. (ECF No. 54-14, Findings ¶ 468.)

Plaintiffs decided to withdraw Q.C. and enroll her at Forsyth Country Day School ("FCDS"), where she is currently a student. (ECF No. 56-2 at 11.) FCDS enrolled her in a Preschool-Four class rather than in kindergarten, but she was with non-disabled students. (ECF No. 54-14, Findings ¶¶ 487, 489.) FCDS employed a number of strategies to keep Q.C. engaged and provide a smooth transition, which appear to have been effective. (*See id* ¶¶ 487– 509.)

Plaintiffs filed a due process petition in the North Carolina Office of Administrative Hearings against Defendant on November 9, 2018, alleging violations of IDEA. (ECF Nos. 11 ¶ 93; 32 ¶ 93.) On August 23, 2019, the Administrative Law Judge ("ALJ") found in favor of Plaintiffs. (ECF No. 54-14.) The ALJ concluded that "the least restrictive environment for Q.C. was the regular education setting" and Q.C. should not have been reassigned to a separate education setting. (*Id.*, Conclusions ¶ 74.) Further, the ALJ concluded that Defendant did not decide to reassign Q.C. with meaningful input from Plaintiffs and the IEP meetings, but instead "predetermined Q.C.'s placement in the separate setting" before holding IEP meetings. (*Id.* ¶ 105.) Finally, the ALJ concluded that Defendant made numerous procedural violations of IDEA. (*Id.* ¶¶ 36, 37, 43, 65, 74, 76, 90, 91.) As part of the ALJ's ordered relief, Defendant was ordered to contract with an "inclusion specialist" to support the development of a new IEP and allow Q.C. to attend the elementary school of Plaintiffs' choice. (*Id.* at 108.) Neither party appealed the ALJ's Final Decision. (ECF Nos. 11 ¶ 26; 32 ¶ 26.)

Plaintiffs toured two other of Defendant's elementary schools. During these visits, they learned that no students with Down syndrome attended either school. (ECF Nos. 11

¶¶ 108, 110; 32 ¶¶ 108; 110.)  One school's principal stated during a tour that students with IQ scores of less than 40 or 50 were assigned to a separate special education classroom, but Defendant's Chief Program Officer for Exceptional Children corrected him.  (ECF Nos. 11 ¶ 106; 32 ¶ 106; 56-86 at 213:18–214:23; 56-87 at 70:22–71:3; 56-88 151:13–152:24.) Defendant testified that students at that school are not placed based on IQ score.  (ECF No. 56-86 at 213:18–214:23 (calling the principal's statement "incorrect").)

Thereafter, Plaintiffs reached out to other families with children with Down syndrome enrolled in Defendant's schools.  (*See generally* ECF No. 56-88 at 202:11–225:25.)  Plaintiffs knew some of these families personally and obtained contact information for others through the Down Syndrome Association of Greater Winston-Salem.  (*Id.*)  As discussed in greater detail below, Plaintiffs have submitted affidavits from seventeen of these parents detailing their experiences in Defendant's schools.  (ECF Nos. 61-1–61-19.)  These students were each placed in the Special Children's School for preschool, the Readiness classroom for elementary school, Lowrance middle school, or were otherwise separated from their nondisabled peers. (*Id.*; *see* ECF No. 63 at 16–18 (summarizing student placements).)  For its part, Defendant does not track which students have been diagnosed with Down syndrome or how those students are placed.  (ECF No. 56-86 at 23:11-17.)

## C.  Procedural History

Plaintiffs filed suit on November 21, 2019, seeking declaratory, compensatory, injunctive, and equitable relief, as well as attorneys' fees and reimbursement of private school tuition.  (ECF No. 1.)  Thereafter, Defendant held an IEP meeting with the assistance of the inclusion specialist ordered by the ALJ on February 7, 2020.  (ECF Nos. 54-19; 54-20.) Together, the newly formed IEP Team developed an IEP that allowed Q.C. to receive 30

9

minutes of speech/language instruction in a special education classroom but otherwise learn each day alongside her non-disabled peers with support from an assistant. (ECF No. 55-19 at 10.) Plaintiffs nevertheless declined to re-enroll Q.C. and expressed concern that Q.C. would be discriminated again on the basis of disability when the new IEP expired one year later. (ECF Nos. 54-21 at 2; 56-87 at 116:1-20; 56-88 at 253:10-21.) On February 11, Plaintiffs filed their Amended Complaint. (ECF No. 11.)

Defendant moved to dismiss the suit on March 12, 2020, (ECF No. 14), which motion was denied on April 15, 2021, (ECF No. 29). This Court held that Plaintiffs sufficiently alleged an imminent threat of future harm and therefore had standing to pursue their claims for declaratory, injunctive, and equitable relief. (*Id.* at 8.) Plaintiffs' claims were not barred by *res judicata*, since Plaintiffs did not have an opportunity to press their Section 504, ADA, or § 1983 claims before the ALJ. (*Id.* at 11.) Plaintiffs sufficiently alleged facts to "support a finding of bad faith or gross misjudgment on part of Defendant" as required by Section 504 and the ADA. (*Id.* at 14.) And Plaintiffs "set forth a plausible § 1983 equal protection claim that may be imputed to Defendant." (*Id.* at 18.) The parties subsequently settled Plaintiffs' claims for attorneys' fees and reimbursement of private school tuition, and those claims were dismissed by Order of this Court on June 29, 2021. (ECF No. 40.)

The parties filed cross motions for summary judgment on January 31, 2022. (ECF Nos. 54; 56.) On March 2, 2022, and March 23, 2022, Plaintiffs filed unopposed motions to seal minors' educational and medical records, contact information of the minors' parents, and other personally identifiable information about the minors. (ECF Nos. 59; 66.) Jury trial is set in this matter for July 5, 2022. (ECF No. 44.)

The Court will first address an evidentiary objection raised in the briefing. The Court will then turn to the parties' summary judgment motions before concluding with Plaintiffs' unopposed motions to seal.

## II.     RULE 26(a)(1) OBJECTION

In their Response to Defendant's Motion for Summary Judgment, Plaintiffs rely in part on affidavits from the seventeen parents of children with Down syndrome mentioned above and one advocate who worked with those parents. (ECF No. 63 at 13–18 (citing ECF Nos. 61-2–61-19).) In its Reply, Defendant objects to inclusion of those declarations, arguing that Plaintiffs did not identify these affiants in their Initial Disclosures. (ECF No. 64 at 4–8.) Plaintiffs filed a Surreply responding to Defendant's objection with this Court's permission on May 18, 2022. (ECF No. 72.)

Initial disclosures must include "the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment." Fed. R. Civ. P. 26(a)(1)(A)(i). If a party "learns that in some material respect the disclosure or response is incomplete or incorrect," it must supplement or correct its initial disclosure "if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A).

If a party fails to identify a witness in its initial disclosure or amendment, "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). "District courts are accorded 'broad discretion' in determining whether a party's nondisclosure

11

or untimely disclosure of evidence is substantially justified or harmless." *Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 190 (4th Cir. 2017) (quoting *Wilkins v. Montgomery*, 751 F.3d 214, 222 (4th Cir. 2014)).  Courts consider:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

*Id.*  The first four factors relate to the harmlessness exception; the fifth factor relates to the substantial justification exception.  *Id.*  "The party failing to disclose information bears the burden of establishing that the nondisclosure was substantially justified or was harmless."  *Id.*

Here, Plaintiffs identified in their Initial Disclosures "Families of other students with Down syndrome who either reside or have resided within the WS/FCS district during the time when Q.C. was eligible to be a student in WS/FCS who have experienced similar discrimination" as having discoverable information concerning Plaintiffs' allegations "related to the Defendant's systemic discrimination of students with Down syndrome." (ECF No. 64-1 at 3.)  Plaintiffs did not, however, disclose the names or contact information of these individuals. (*Id.*)  As discussed, it appears that Plaintiffs knew the identity, contact information, and general experience of some of the affiants, though they learned the details of these experience and the identity of the remaining affiants during discovery.  (*See generally* ECF No. 56-88 at 202:11–225:25.)  Thus, the Court finds that Plaintiffs did violate Rule 26(a) with respect to individuals known to Plaintiffs prior to filing their Initial Disclosures.

However, these violations are harmless.  First, although Plaintiffs did not amend their Initial Disclosures, they did share the affiants' names and contact information in their supplemental responses to Defendant's interrogatories. (ECF Nos. 68-2 at 7–11; 68-3 at 11–

12; 68-4 at 12–13; 68-5 at 13–14.) Defendant also located and reviewed the educational records of each affiant, which were requested by the affiants via an attorney separate from but during this litigation. (ECF Nos. 56-86 at 225:18–227:23; 69-6 ¶¶ 2–13.) Further, Defendant extensively questioned Plaintiffs about the affiants during their depositions. (ECF Nos. 56-87 at 123:5–139:25; 56-88 at 202:6–225:15.) Defendant should therefore not have been surprised that Plaintiffs would rely on these affidavits in opposing its motion for summary judgment. Indeed, it appears that Defendant anticipated Plaintiffs' use of these affidavits by preemptively arguing in its opening memorandum that evidence of "generalized concerns regarding alleged patterns or practices" by Defendant and "the placement of some students with Down syndrome in a separate setting" is insufficient to show Plaintiffs have standing or Defendant maintained a discriminatory policy or custom. (ECF No. 55 at 13, 18.)

Second, Defendant could have further minimized its surprise by locating and reviewing the records of children who struggled with developmental disabilities or otherwise had IEPs. These records were in Defendant's possession and were specifically requested by Plaintiffs during discovery. (*See* ECF Nos. 56-86 at 300; 69-6 ¶ 2.) Defendant, however, chose not to contact any administrators or special education teachers to ask about their experiences working with students with Down syndrome or otherwise attempt to identify those students. (ECF No. 56-86 at 35:21–36:2, 67:18-25.)

Third, it does not appear that admitting the evidence at this stage will disrupt trial. Fourth, the evidence is of some importance as discussed herein, but is not central to Plaintiffs' claims that Defendant discriminated against Q.C. Finally, it appears that Plaintiffs were not initially aware of the details of the affiants' experiences. (*See generally* ECF No. 56-88 at 202:11–225:25.) After receiving Defendant's interrogatories, Plaintiffs contacted those families to

13

inquire about their experiences and promptly relayed that information to Defendant in their responses. (*Id.*)

Thus, the Court finds that Plaintiffs' Rule 26(a) violations were harmless, and the affidavits may be considered for purposes of the motions for summary judgment before the Court.

## III.  SUMMARY JUDGMENT

Defendant argues that (1) Plaintiffs lack standing to seek declaratory, injunctive, or equitable relief, (2) no evidence shows Defendant violated the Equal Protection Clause, and (3) Plaintiffs cannot establish that Defendant violated Section 504 or the ADA.  (ECF Nos. 55; 58; 64.)  Plaintiffs dispute these arguments and contend that they are entitled to summary judgment on their Section 504 and ADA claims.  (ECF Nos. 57; 63; 65.)

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party." *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 568 (4th Cir. 2015) (internal citations and quotations omitted).  "[I]n deciding a motion for summary judgment, a district court is required to view the evidence in the light most favorable to the nonmovant" and to "draw all reasonable inferences in his favor." *Harris v. Pittman*, 927 F.3d 266, 272 (4th Cir. 2019) (citing *Jacobs*, 780 F.3d at 568).  A court "cannot weigh the evidence or make credibility determinations," *Jacobs*, 780 F.3d at 569 (citations omitted), and thus must "usually" adopt "the [nonmovant's] version of the facts," even if it seems unlikely that the moving party would prevail at trial, *Witt v. W. Va. State Police, Troop 2*, 633 F.3d 272, 276 (4th Cir. 2011) (quoting *Scott v. Harris*, 550 U.S. 372, 378 (2007)).

Where the nonmovant will bear the burden of proof at trial, the party seeking summary judgment bears the initial burden of "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party carries this burden, then the burden shifts to the nonmoving party to point out "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In so doing, "the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013). Instead, the nonmoving party must support its assertions by "citing to particular parts of . . . the record" or "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1); *see also Celotex*, 477 U.S. at 324.

## A. Standing

The jurisdiction of a federal court is limited to cases and controversies under Article III of the United States Constitution. U.S. Const. art. III, § 2. Standing to sue, therefore, "ensure[s] that federal courts do not exceed their authority." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Parties invoking federal jurisdiction bear the burden of establishing that they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). A plaintiff who seeks to enjoin future action "must demonstrate that he is immediately in danger of sustaining some direct injury as the result of the challenged official conduct" and the threat of injury is "real and immediate." *Beck v. McDonald*, 848 F.3d 262, 277 (4th Cir. 2017) (internal quotations omitted). At the

summary judgment stage, "the plaintiff can no longer rest on . . . 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' which for purposes of the summary judgment motion will be taken to be true." *Lujan*, 504 U.S. at 561 (internal citation omitted) (quoting Fed. R. Civ. P. 56(e)).

Here, Defendant argues that Plaintiffs have failed to show "real and immediate" danger of injury because (1) they have not demonstrated an intention to re-enroll Q.C. in Defendant's schools, (2) the IEP established on February 7, 2020, granted Plaintiffs the relief they seek, and (3) any evidence of a pattern or practice of discriminatory treatment of other children is insufficient to establish that Q.C. faces immediate discrimination. (ECF No. 55 at 10–13.)

Defendant's arguments are unpersuasive. First, Plaintiffs maintain that, due to Defendant's conduct, Q.C. fell behind academically and had to repeat a year of preschool. (ECF No. 11 ¶ 198(b).) This is a concrete and particularized injury which, taking the evidence in the light most favorable to Plaintiffs, is fairly traceable to Defendant's conduct and redressable through damages. This claim for damages was alleged as part of Plaintiffs' first three causes of action and has not been dismissed. (*See* ECF No. 40 (dismissing only Counts IV and V of the Amended Complaint).)

Second, Plaintiffs seek declaratory, injunctive, and equitable relief from an *ongoing* injury. Q.C. is currently attending private school rather than the school of her choice because of Defendant's alleged discriminatory practices. Q.C. has a right of equal access to Defendant's schools, and deprivation of that right is a cognizable injury. *See Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 657 (1993) ("The 'injury in fact' element of standing in such an equal protection case is the denial of equal treatment

16

resulting from the imposition of the barrier ... not the ultimate inability to obtain the benefit.").

Taking the evidence in the light most favorable to Plaintiffs, this injury is fairly traceable to Defendant's conduct. A genuine issue of material fact exists whether Defendant places children based on disability without assessing students' individual capabilities or providing reasonable accommodations. Plaintiffs' evidence tends to show: (1) Q.C.'s placement was changed in Summer 2018 from Whitaker to the Readiness classroom based solely on an inappropriate psychoeducational evaluation; (2) Q.C. was removed from class without an IEP; (3) Q.C.'s initial IEP required her to again be reassigned to the Readiness classroom; (4) students in the Readiness classroom are completely segregated from non-disabled peers, contradicting Q.C.'s IEP provision that she would spend meals and recess with non-disabled peers; (5) Whitaker's principal stated that Q.C. would not have been placed at Whitaker if they had known of her disability; (6) the principal at another elementary school stated that students are segregated at that school based on IQ; and (7) no student known to have Down syndrome is integrated into a class with non-disabled students. Taking this evidence in the light most favorable to Plaintiffs, a reasonable juror could conclude that Defendant does not assess the least restrictive environment appropriate for each individual student but rather places students based on disability. Q.C.'s mother testifies that she would re-enroll her children in public school if Defendant committed "to honoring the least restrictive environment" for students like Q.C. with Down syndrome. (ECF No. 56-88 at 244:21–245:2.) Plaintiffs' injury is therefore fairly traceable to Defendant's alleged discriminatory practice and can be redressed through declaratory, injunctive, or equitable relief.

The temporary IEP adopted in February 2020 does not change this analysis. "It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982). Although the IEP granted Q.C. temporary reprieve from the alleged discriminatory practices she faced, it could be re-assessed at any time, necessarily expired in February 2021, and did nothing to remedy Defendant's alleged practice of discriminating against students with Down syndrome. According to Plaintiffs, Defendant made no assurances that Q.C. would be permitted to remain with her peers after its expiration. (ECF No. 56-87 at 89:21–90:10.) The school officials who initially discriminated against Q.C. remain in charge of Whitaker, (*id.* at 114:3-24), the inclusion specialist hired at the ALJ's direction has not been retained, (ECF No. 56-86 at 50:9-13, 51:4-6), and although Defendant administered training for its teachers and administrators on assessing students' least restrictive environments, Defendant testified that it takes "three to seven years" before those trainings would become institutionalized, (*id.* at 47:5–49:18). Had Q.C. re-enrolled, she would have been subject to Defendant's alleged discriminatory practice for the remainder of her primary and secondary schooling unless Defendant voluntarily extended her IEP each year or reformed its placement procedures. Thus, Defendant's decision to provide Q.C. temporary relief from its otherwise allegedly discriminatory treatment of students with Down syndrome did not negate Plaintiff's ongoing injury or deprive this Court of jurisdiction.

Therefore, the Court finds that Plaintiffs have offered evidence of past and ongoing injuries that are fairly traceable to Defendant's conduct and can be redressed through damages and declaratory, injunctive, and equitable relief.

18

## B.     Section 504 and the ADA

Defendant next argues that Plaintiffs' Section 504 and ADA claims fail because (1) Q.C. was not excluded because of her disability and (2) Plaintiffs have not offered evidence of bad faith or gross misjudgment.  (ECF No. 55 at 19–23.)  Plaintiffs argue that Defendant's removal of Q.C. from her non-disabled peers and failure to grant her reasonable accommodations violated Section 504 and the ADA as a matter of law.  (ECF No. 57 at 10–29.)

As briefly outlined in Section I.A, *supra*, Section 504 of the Rehabilitation Act prohibits organizations that receive federal funds from excluding participation, denying benefits, or otherwise discriminating against any person "solely by reason" of disability.  29 U.S.C. § 794.  A federal funds recipient violates Section 504 both by actively excluding an individual with a disability from participation and constructively excluding her by failing to provide her with the "reasonable accommodations" required to have "meaningful access to the benefit."  *Alexander*, 469 U.S. at 301.  The ADA contains nearly identical language, *see* 42 U.S.C. § 12132, and the two laws "generally are construed to impose the same requirements due to the similarity of the language of the two acts," *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 468 (4th Cir. 1999).  However, where Section 504 prohibits discrimination against individuals "solely by reason" of disability, the ADA also prohibits discrimination where "disability was a motivating cause— as opposed to the sole cause—of discrimination."  *Id.*  To prevail under either law, a plaintiff must show that "(1) she has a disability, (2) she is otherwise qualified to receive the benefits of a public service, program, or activity, and (3) she was excluded from participation in or denied the benefits of such service, program, or activity, or otherwise discriminated against,

19

on the basis of her disability." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005).

Section 504 is similar to IDEA, discussed in Section I.A, *supra*, in that it requires students with disabilities to be educated with non-disabled students "to the maximum extent appropriate to the needs of the [disabled] person" and "in the regular educational environment . . . unless it is demonstrated by the [school system] that the education of the person in the regular environment with the use of supplementary aids and services cannot be achieved satisfactorily." 34 C.F.R. § 104.34(a). And students must be evaluated using validated tests "tailored to assess specific areas of educational need" to "accurately reflect the student's aptitude or achievement level" before deciding the student's initial placement or making "any subsequent significant change in placement." §§ 104.35(a), (b).

However, the mere failure to provide an appropriate IEP does not create Section 504 liability. *Sellers ex rel. Sellers v. Sch. Bd. of City of Mannassas*, 141 F.3d 524, 529 (4th Cir. 1998). Courts play a "delicate role" in reviewing education decisions and should not substitute their own judgment for that of an educator "given the great deference to which local school officials' educational judgments are entitled." *K.D. ex rel. J.D. v. Starr*, 55 F. Supp. 3d 782, 789 (D. Md. 2014) (quoting *Doe v. Arlington Cnty. Sch. Bd.*, 41 F.Supp.2d 599, 609 (E.D. Va. 1999)). Thus, "to turn an IDEA violation into § 504 discrimination," a plaintiff must show that defendant's action constituted "bad faith or gross misjudgment." *S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cnty.*, 819 F.3d 69, 75–76 (4th Cir. 2016) (citing *Sellers*, 141 F.3d at 529). As the Fourth Circuit explained:

> The reference in the Rehabilitation Act to "discrimination" must require, we
> think, something more than an incorrect evaluation, or a substantively faulty
> individualized education plan, in order for liability to exist. Experts often

disagree on what the special needs of a handicapped child are, and the educational placement of such children is often necessarily an arguable matter. That a court may, after hearing evidence and argument, come to the conclusion that an incorrect evaluation has been made, and that a different placement must be required under [IDEA], is not necessarily the same thing as a holding that a handicapped child has been discriminated against solely by reason of his or her handicap.

*Sellers*, 141 F.3d at 529 (quoting *Monahan v. Nebraska*, 687 F.2d 1164, 1170 (8th Cir. 1982)).

"What constitutes bad faith or gross misjudgment in this context has not been well defined." *O.V. v. Durham Pub. Sch. Bd. of Educ.*, No. 1:17CV691, 2018 WL 2725467, at *23 (M.D.N.C. June 6, 2018) (quoting *K.D.*, 55 F. Supp. 3d at 789), *report and recommendation adopted*, No. 1:17-CV-691, 2018 WL 3370644 (M.D.N.C. July 10, 2018). While mere negligence or an incorrect evaluation will not suffice, bad faith or gross misjudgment may be present where defendants consistently fail to honor agreed-upon accommodations, routinely make unilateral decisions outside of the IEP process, abruptly decide to discontinue significant parts of a student's educational program without proper assessments and evaluations or lie to parents in IEP meetings and rely on such falsehoods in formulating the child's IEP. *Id.* at *24 (collecting cases).

Here, genuine issues of material fact preclude the Court from awarding summary judgment to either party. Plaintiffs' evidence tends to show that Defendant repeatedly attempted to segregate Q.C. away from her non-disabled peers rather than provide her with reasonable accommodations. It reassigned Q.C. to the Readiness classroom based on an inappropriate test without attempting to provide any accommodations, withdrew Q.C. from class without an IEP or Plaintiffs' knowledge or consent, created an IEP that isolated Q.C. for nearly the whole school day, and again reassigned Q.C. to the Readiness classroom where she would have been more segregated from her non-disabled peers than even her IEP

21

required. Q.C.'s experience in private school supports that she could have succeeded at Whitaker with reasonable accommodations but was not given that chance. Further, as discussed in Section III.A., *supra*, Plaintiffs' evidence supports that Defendant explicitly segregated Q.C. and other students based on their Down syndrome rather than their aptitude. This evidence, taken in the light most favorable to Plaintiffs, demonstrates more than mere negligence and is sufficient to support a finding of bad faith or gross misjudgment.

On the other hand, Defendant's evidence tends to show that Q.C. was allowed to begin kindergarten at Whitaker but quickly demonstrated "a lot of negative behaviors." (ECF No. 56-88 at 78:17–79:21.) Defendant submits evidence that Q.C. crawled under tables, put instructional materials in her mouth, threw materials, took and destroyed other students' materials, played in toilets, removed her clothing, refused to come in from recess, and kicked, hit, and licked other students. (ECF Nos. 54-4 ¶ 7; 54-5 ¶ 6.) Defendants attempted to provide Q.C. with some accommodations, including certain instructional strategies employed by Q.C.'s special education teacher. (ECF No. 54-14 ¶ 308.) Although the ALJ concluded that Defendants failed to adhere to IDEA and adopt an appropriate IEP for Q.C., a reasonably jury could conclude that these failures did not demonstrate bad faith or gross misjudgment, but merely a negligent attempt to educate a student who had difficulty learning in a traditional classroom.

Thus, genuine issues of material fact preclude this Court from granting either party summary judgment on Plaintiffs' Section 504 and ADA claims.

## C. Equal Protection Clause

Defendant next moves for summary judgment on Plaintiff's Equal Protection Clause claim brought pursuant to § 1983. (ECF No. 55 at 14–19.)

22

The Fourteenth Amendment to the U.S. Constitution prohibits states from denying "to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). When considering an equal protection claim, a court must determine (1) "what level of scrutiny applies" and (2) "whether the law or policy at issue survives such scrutiny." *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 607 (4th Cir.), *as amended* (Aug. 28, 2020), *cert. denied*, 141 S. Ct. 2878 (2021).

Generally, a state policy "is presumed to be valid and will be sustained if the classification drawn by the [policy] is rationally related to a legitimate state interest." *Cleburne*, 473 U.S. at 440. Courts engage in heightened scrutiny only when the challenged state action "trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage." *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976). The Supreme Court does not recognize mental illness or disability as a suspect classification, *Cleburne*, 473 U.S. at 442, or education as a fundamental personal right, *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 37 (1973); *Sellers*, 141 F.3d at 530–31. Thus, the Court will analyze Plaintiffs' claim under the rational basis test.

The rational basis test "allows the States wide latitude, and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes." *Cleburne*, 473 U.S. at 442 (citations omitted). Courts "defer[ ] to legislative determinations as to the desirability of particular statutory discriminations" under this test and "may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations." *Dukes*, 427 U.S. at 303. Although a state "may not rely on a classification whose relationship

23

to an asserted goal is so attenuated as to render the distinction arbitrary or irrational," *Cleburne*, 473 U.S. at 442, courts must uphold state actions so long as "*any* state of facts *either known or which could reasonably be assumed* affords support for it," *United States v. Carolene Prod. Co.*, 304 U.S. 144, 148 (1938) (emphasis added). Thus, "even if the government's actual purpose in creating classifications is not rational, a court can uphold the [governmental action] if the court can envision some rational basis for the classification." *Guerra v. Scruggs*, 942 F.2d 270, 279 (4th Cir. 1991). Categories under this test may be underinclusive or overinclusive and "need not 'strike at all evils at the same time.'" *Dukes*, 427 U.S. at 305 (quoting *Semler v. Dental Examiners*, 294 U.S. 608, 610 (1935)). State actions are presumed to be constitutional under rational basis review, and challengers bear the burden to prove unconstitutionality. *Carolene Prod.*, 304 U.S. at 148.

In the education context, a student alleging discrimination based on disability must show that (1) the school board "intended to treat children differently because of their disabilities" and (2) that decision "was without any rational basis." *Sellers*, 141 F.3d at 530–31. This is a "higher standard of liability" than imposed by IDEA, and "school boards will be subject to liability for statutory IDEA violations much more frequently than for similarly pled constitutional claims." *Id.* at 530. Section 504 similarly provides protections to students with disabilities beyond what is protected by rational basis review under the Equal Protection Clause. *See Cleburne*, 473 U.S. at 443 (finding that passage of Section 504 "belies a . . . need for more intrusive oversight by the judiciary" under the Equal Protection Clause); *O.V.*, 2018 WL 2725467, at *30 (holding that a school district's consideration of a disabled student's special needs survives rational basis review "even if grossly misapplied in violation of the IDEA, the ADA, and/or Section 504").

24

Here, Q.C. demonstrated special needs while at Whitaker. She had some low psychoeducational scores, demonstrated behavioral concerns, and had difficulty sitting still and completing certain tasks. Thus, Defendant had a legitimate interest in providing Q.C. with individual attention in a way that was cost effective and did not take away from or disrupt the education of other students. Defendant's decision to separate Q.C from her peers and reassign her to the Readiness classroom was rationally related to these interests. Concentrating students with developmental disabilities into a single location allows a school district to hire and train a small number of teachers and administrators who consistently work with disabled students rather than train all teachers and administrators to work with students who may rarely appear in their classrooms. Such a scheme may not have been in Q.C.'s best interest and may have violated Section 504, the ADA, or IDEA, but it was not irrational.

Plaintiffs submit evidence that children with Down syndrome do not invariably have low IQ scores or function at a low academic level, and that such "assumptions that we make from years and years of stereotypes" are prejudicial and harmful. (ECF No. 56-76 at 51:25-52:19.) A policy that segregated all disabled students regardless of ability, therefore, might be irrational and vulnerable to an Equal Protection challenge. *See Carolene Prod.*, 304 U.S. at 153–54 ("[T]he constitutionality of a statute, valid on its face, may be assailed by proof of facts tending to show that the statute as applied to a particular [plaintiff] is without support in reason because the [plaintiff], although within the prohibited class, is so different from others of the class as to be without the reason for the prohibition."); *Cleburne*, 473 U.S. at 446 ("The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational."). However, the undisputed facts in this case show that Q.C. did require some individualized treatment and accommodation. Defendant's

Case 1:19-cv-01152-LCB-JEP   Document 74   Filed 05/26/22   Page 25 of 29

method of responding to this need, even when viewed in the light most favorable to Plaintiff, was not arbitrary or irrational.

Thus, Defendant will be granted summary judgment on Plaintiffs' Equal Protection Claim brought pursuant to § 1983.

## IV.  MOTIONS TO SEAL

Finally, Plaintiffs seek leave to file under seal portions of the declarations and their attachments submitted in support of their Response in Opposition to Defendant's Motion for Summary Judgment, (ECF No. 59), and portions of Plaintiffs' discovery responses submitted in support of their Surreply in Opposition to Defendant's Motion for Summary Judgment, (ECF No. 66).

The public has a right, derived from both common law and the First Amendment, "of public access to documents or materials filed in a district court." *Va. Dep't of State Police v. Washington Post*, 386 F.3d 567, 575 (4th Cir. 2004). When the subjects of a motion to seal are documents attached to a summary judgment motion in a civil case, "the more rigorous First Amendment standard" governs the court's analysis. *Id.* at 576 (quoting *Rushford v. New Yorker Mag., Inc.*, 846 F.2d 249, 253 (4th Cir. 1988)). Under this standard, "a district court may restrict access 'only on the basis of a compelling governmental interest, and only if the denial is narrowly tailored to serve that interest.'" *Id.* at 575 (quoting *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 178, 180 (4th Cir. 1988)). "Public access serves to promote the trustworthiness of the judicial process, to curb judicial abuses, and to provide the public with a more complete understanding of the judicial system, including a better perception of fairness." *Doe v. Pub. Citizen*, 749 F.3d 246, 266 (4th Cir. 2014). "Any step that withdraws an element of the judicial process from public view makes the ensuing decision look more like a fiat and requires

rigorous justification." *Id.* Thus, before granting a motion to seal, a court must "(1) provide public notice of the sealing request and a reasonable opportunity for the public to voice objections to the motion; (2) consider less drastic alternatives to closure; and (3) . . . state its reasons—with specific findings—supporting closure and its rejections of less drastic alternatives." *Id.* at 272.

Here, Plaintiffs seek to seal eighteen affidavits filed by the parents of students who have Down syndrome and are or were enrolled in Defendant's schools, their educational records, and Plaintiffs' discussion of these individuals in their discovery responses. (ECF Nos. 59; 66.) These documents contain personal information about minors who are not parties to this suit concerning their disabilities and experiences in Defendant's schools.

The Court finds that protecting these sensitive educational records and sealing information that could identify non-party minors is a compelling interest reflected in federal law, North Carolina law, and the Federal Rules of Civil Procedure. *See* 20 U.S.C. § 1232g(b)(1) (prohibiting recipients of federal funds from releasing educational records or personally identifiable information of students without parental consent); N.C. Gen. Stat. § 115C-402(e) ("[T]he official record of each student is not a public record . . . [and] shall not be subject to inspections and examination."); *see also* Fed. R. Civ. P. 5.2(a)(3) (allowing those making filings in court to identify minors by their initials). This compelling interest outweighs the public's limited interest in reviewing the educational records of minors who are not party to the suit.

Endeavoring to employ less drastic alternatives to sealing, Plaintiffs have filed unsealed, redacted copies of the affidavits and discovery responses. (ECF Nos. 62-2–62-19; 72-1–72-4.) The minors' personal information is so pervasive throughout the remaining educational

27

records that redaction of those documents is not possible. The Court therefore finds that sealing these documents is narrowly tailored to the compelling interest.

Plaintiffs' motions to seal have been publicly docketed since their dates of filing on March 2 and March 23, 2022. (ECF Nos. 59; 66.) Thus, the public has had ample notice and opportunity to oppose the motion. Notably, no member of the public nor Defendant opposes either motion. Plaintiffs have filed unsealed, redacted copies of the affidavits and discovery responses, and there are no less drastic alternatives to sealing the remaining documents in full. Moreover, this Court does not rely on any information contained in the redacted or sealed documents in resolving the parties' motions for summary judgment, and this Court's discussion of the content of the sealed documents herein is sufficient to satisfy the public's limited interest in their content.

Thus, the Court will grant Plaintiffs' unopposed motions to seal.

For the reasons state herein, the Court enters the following:

## ORDER

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment, (ECF No. 54), is **GRANTED** in part and **DENIED** in part. It is **GRANTED** as to Plaintiffs' claims arising under 42 U.S.C. § 1983. It is **DENIED** as to all remaining claims.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Partial Summary Judgment, (ECF No. 56), is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Leave to File Documents Under Seal, (ECF No. 59), is **GRANTED**.

28

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Leave to file Documents Under Seal, (ECF No. 66), is **GRANTED**.

This, the 26th day of May 2022.

/s/ Loretta C. Biggs
United States District Judge